William Kenny STEPHENS,
Petitioner–Appellant,
Cross–Appellee,

v.

Ralph KEMP, Warden, Georgia Diagnostic and Classification Center,
Respondent–Appellee, Cross–Appellant.

No. 84–8540.

United States Court of Appeals,
Eleventh Circuit.

April 22, 1988.
Rehearing and Rehearing En Banc
Denied May 27, 1988.

John Rogers Carroll, Charles A. Glackin, Thomas Colas Carroll, Philadelphia, Pa., James K. Jenkins, Savannah, Ga., for petitioner-appellant, cross-appellee.

Paula K. Smith, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee, cross-appellant.

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

HILL, Circuit Judge:

This case is before the court on appeal from the district court's denial of appellant William Kenny Stephens' petition for writ of habeas corpus filed pursuant to 28 U.S. C. § 2254.

In 1980 appellant was found guilty of one count of murder and three counts of aggravated assault, the victim in each case being a police officer. He was sentenced

**644**

to death for the murder and to consecutive sentences of twenty years in prison on each count of aggravated assault. The conviction and sentences were subsequently affirmed by the Georgia Supreme Court. *Stevens [sic] v. State*, 247 Ga. 698, 278 S.E.2d 398 (1981), *cert. denied*, 463 U.S. 1213, 103 S.Ct. 3551, 77 L.Ed.2d 1398 (1983).

In its opinion affirming the conviction and sentences, the Supreme Court of Georgia set forth the facts of the case as follows:

> The record establishes that on January 22, 1979, the police stopped the defendant for questioning regarding the burglary of a department store in which several weapons had been taken. It was discovered that he was driving under the influence and without a license, whereupon he was arrested. After being questioned at the police station, the defendant agreed to ask around and find out who was involved in the burglary in exchange for his release upon his own recognizance. As a condition to his release, he was to report back by a certain time. When he did not contact the officer at the appointed time, nor for two days thereafter, the police began to look for him. On January 24, investigator Larry Stevens of the Richmond County Sheriff's Department located the defendant, followed him a short way and then stopped him. When the officer stopped the defendant, he radioed this fact and his location to fellow officers.

> After the investigator stopped his automobile, he opened his car door and apparently leaned back to do something with his radio. The defendant fired into the car through the windshield striking investigator Stevens in the right forearm and rendering his right arm below the elbow useless. The police officer managed to get his gun out and fired wild shots through his automobile at the defendant. The defendant fired a second shot striking the officer in the right side. Then the defendant walked to the rear of the investigator's automobile, turned, raised the weapon up to shoulder height, and fired in a very calm, deliberate manner through the rear window. The round hit the officer in the chest and was almost immediately fatal. The defendant then went to his car and drove off at a high rate of speed. He intended to go to his mother's house, but stopped on the way at a store to purchase more ammunition. When he approached his mother's house, authorities were waiting for him, and a high speed pursuit then occurred. This occurred approximately twenty-five minutes after the murder. Officers finally trapped the defendant in a cul-de-sac, and a gun battle with the police then ensued. The defendant maintained that when investigator Stevens stopped him, he exited his automobile with a loaded rifle in order to show the officer that he had recovered some of the guns from the burglary and that as he approached the officer's car, the officer, for no reason, shot at him at which instance the defendant then opened fire shooting the officer in self-defense.

> "Monkey" Warren testified that the defendant and Paul Lewis came to him on the Saturday night before the victim was killed and showed him some guns they wanted to sell him. The defendant showed him a rifle of the same type that killed the victim and when he didn't want to buy it, the defendant shot through the floor and left.

247 Ga. at 699, 278 S.E.2d at 401.

The defendant testified at trial that as he got out of his car and walked back toward the investigator's car carrying a loaded rifle the investigator suddenly and without provocation began firing at him, and that he only fired back in self-defense. The state proved its case by producing expert testimony concerning the likely sequence and effect of each of the shots fired during the incident as well as the eyewitness testimony of a letter carrier who, while making his rounds, happened upon the crime while it was in progress.

Appellant filed a petition for a writ of habeas corpus in state court in August 1983. That petition was denied following a hearing, and the Georgia Supreme Court denied appellant's petition for a certificate

of probable cause to appeal. Appellant then filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254. Shortly thereafter, appellant's counsel, who had represented him at trial, on appeal, and on his first state habeas petition, withdrew from the case and was replaced by new counsel. New counsel amended the petition to include numerous allegations of ineffective assistance of counsel. Because those claims had never been presented to the state courts, the district court dismissed the petition in accordance with the Supreme Court's decision in *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Appellant returned to state court, where his second petition for habeas corpus relief was denied on the grounds that it was successive and that appellant had waived his ineffective assistance of counsel claims by not raising them in the original state habeas petition.

Appellant then filed the federal habeas corpus petition that is now before this court. Following an evidentiary hearing on appellant's claims of ineffective assistance of counsel, the district court issued a lengthy opinion and order finding appellant's claims to be without merit and dismissing the petition in its entirety. 592 F.Supp. 228.

Appellant raises the following claims of error on this appeal:

(1) The district court erred in refusing to hold an evidentiary hearing at which appellant would have been permitted to introduce expert testimony in support of his claims that his constitutional rights were violated when the trial court refused to provide funds for a ballistics expert to aid him with his defense.

(2) The district court erred in refusing to allow appellant to introduce at an evidentiary hearing the expert testimony of a psychiatrist who would have testified concerning appellant's likely mental condition when he was tried and when he committed the crime.

(3) He received ineffective assistance of counsel at trial.

(4) Certain jurors were excluded from the jury in violation of appellant's rights under *Witherspoon v. Illinois*, 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] (1968).

(5) The trial court's instructions on malice and intent violated appellant's constitutional rights under *Sandstrom v. Montana*, 422 [442] U.S. 510 [99 S.Ct. 2450, 61 L.Ed.2d 39] (1978), and progeny, which error was not harmless beyond a reasonable doubt.

(6) The trial court judge improperly interjected himself into the proceedings in violation of appellant's fifth and fourteenth amendment rights.

(7) Georgia's death penalty statute is unconstitutional as applied to appellant.

(8) The trial court's instructions concerning mitigating circumstances in the penalty phase of the trial were constitutionally inadequate.

(9) The trial court improperly excluded certain evidence offered in mitigation in the penalty phase.

(10) Appellant was denied his constitutional rights by the prosecutor's argument to the jury in the penalty phase.

The state argues on its cross-appeal that the district court should have enforced an asserted procedural bar that would have precluded appellant from raising his third claim above on federal habeas.

We address appellant's claims (1) through (7) in the order in which they are presented above. Because of our disposition of appellant's ineffective assistance of counsel claim, we need not and do not address claims (8) through (10) on this appeal.

## DISCUSSION

### I. *Expert Ballistics Assistance Claim*

■ Stephens contends that he was deprived of his constitutional rights by the state's failure to provide funds for the appointment of a ballistics expert to assist in the preparation of an adequate defense. In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court held that the state must provide an indigent defendant with a competent psychiatrist to conduct an appropriate exami-

nation provided the "defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." The issue of whether *Ake* extends beyond an indigent defendant seeking to assert the defense of insanity was argued before this Court in *Moore v. Kemp*, 809 F.2d 702 (11th Cir.1987) (en banc). The opinion for the court in *Moore* found it unnecessary to reach this issue:

> The Supreme Court's statement in *Caldwell* [*v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)] implies that the government's refusal to provide nonpsychiatric expert assistance could, in a given case, deny a defendant a fair trial. The implication is questionable, however, in light of the court's subsequent statement that it had "no need to determine as a matter of federal constitutional law what *if any* showing would have entitled a defendant to assistance of the type [*Caldwell*] sought." *Id.* (emphasis added). We nonetheless assume, for sake of argument, that the due process clause could require the government, both state and federal, to provide nonpsychiatric expert assistance to an indigent defendant upon a showing of need.

*Id.* at 711. Five judges concurred in the opinion to express their belief that *Ake* was limited to its facts. *Id.* (Hill, J., concurring in part and dissenting in part). In the present case, we again postpone the resolution of this issue. As in *Moore*, the petitioner in this case is not entitled to relief even if we assume that states may be required to provide nonpsychiatric expert assistance to indigent defendants. Stephens' claim fails for two reasons. First, the defendant is unable to overcome the "threshold showing that [the issue on which expert assistance is sought was] likely to be a significant factor in his defense." *Ake*, 470 U.S. at 82–83, 105 S.Ct. at 1096. Second, the state's failure to provide funds to employ a ballistic expert in this case did not render Stephens' trial fundamentally unfair.

In *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985), the Supreme Court

tersely rejected a defendant's claim that the state had failed to appoint a criminal investigator, fingerprint expert and ballistics expert in violation of' the constitution. The court disposed of this claim in a footnote, writing: "Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision." *Id.*

In *Moore v. Kemp*, 809 F.2d 702, (11th Cir.1987) (en banc), this court considered a habeas corpus petitioner's claim that he had been denied an adequate defense due to the state's failure to appoint an expert to analyze physical evidence linking the defendant to the crime scene. We held that the defendant had not made a sufficient showing that the failure to appoint an expert had "deprived him of a basic tool of an adequate defense." *Id.* at 709. In considering whether the defendant had made an appropriate request to the trial court for the provision of expert assistance, we restricted our review to a consideration of the facts presented to the state trial court at the time the motion was denied.

In *Moore*, the only sources of information before the state trial court at the time of the ruling consisted of: (1) the petitioner's preliminary hearing, (2) the co-defendant's preliminary hearing, (3) the petitioner's suppression hearing, and (4) the petitioner's motion for the appointment of a criminologist. This court concluded that the defendant had not sufficiently informed the court of the specific evidence which should have been scrutinized by an expert nor had the defendant shown how the expert could have assisted the defendant. The trial court had merely been informed that the defendant "wanted an expert of some kind to review any tests the state crime lab may have performed and to conduct an unspecified number of tests that counsel declined to describe." *Id.* at 717. Thus, *Moore* requires defense counsel to familiarize himself with regard to the specific scientific area in which an expert is needed; although the attorney need not become an expert himself, he must conduct a minimal amount of background work so

that he may intelligently phrase his request so as to inform the judge as to why an expert is needed and what this expert is capable of performing. The *Moore* decision alludes to several factors to be considered in determining whether the defendant has made a sufficient showing that the expert would be "a significant benefit to the truth-seeking function of a trial." *Id.* at 712 n. 8. When a defendant seeks an expert to rebut evidence to be introduced by the state, counsel must first inform the court of the nature of the prosecutor's case. A federal court reviewing a habeas petition must consider: (1) whether the trial judge was informed of the specific evidence which incriminates the defendant, and (2) whether the information which would assist the defendant could be obtained through the state's experts. Secondly, counsel must provide a reasonably specific description of the expert services sought. A reviewing court must therefore examine: (1) whether counsel delineated the specific type of expert sought; (2) whether the trial court was informed as to the availability and costs of the expert who would perform the requested services and, if known, the name of the expert sought, and (3) whether counsel has shown how the expert would contribute to the defense.

In the present case, the state trial judge was presented with significantly less information concerning the nature of the evidence against the defendant than was presented to the trial judge in *Moore.* On January 30, 1979, Stephens was indicted for murder and three counts of aggravated assault. The indictment is drafted in general terms, merely informing the reader that Stephens is charged with murdering Officer Stevens by shooting him with a rifle. Eight days following Stephens' indictment, a motion hearing was held before Superior Court Judge Edwin Fulcher. In presenting a motion to disclose exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), defense counsel outlined some of the physical evidence to be presented by the prosecutor:

> I don't have the resources that the district attorney has. I have to rely upon my own ingenuity and my own investigatory powers and my own interviews, and there's a lot of information I would like because I think it is important. For instance, that's why I subpoenaed all the people from the GBI who were on call and Mr. Ronnie Strength, I would like to know if this information does exist; for instance, whether the deceased fired his weapon? I think that would be material. Or whether or not there was any analysis made of any bullet or projectiles discharged from any gun? Whether or not they conducted any tests upon the deceased's weapon. It may be that the defense may want to use a defense of self-defense; and if we do not have access to information showing that the gun was fired and they'd tested the gun and it showed that it was fired, then we will be denied that defense.... I think [the District Attorney] should be compelled to turn over all these reports, scientific reports.

Defense counsel also sought photographs of the police car in which Officer Stevens was killed:

> I would like to see photographs taken of the scene to determine whether the glass—the impact of the glass was inside the car or outside the car; that would have some bearing of whether or not a shot was fired.

The prosecutor proceeded to give defense counsel the opportunity to examine evidence being held at the Augusta Crime Laboratory.

On January 8, 1980, Judge Franklin Pierce presided over a second round of motions in this trial. This was Judge Pierce's first introduction to this case. At this hearing, defense counsel presented a written motion for appointment of an expert[1] and made the following oral argument:

> NOW COMES Defendant in the above-styled case, moves the Court for an order appointing, authorizing, and directing Otis Hensley, a quali-

1. MOTION FOR APPOINTMENT OF EXPERT WITNESS TO EXAMINE EVIDENCE OF STATE

THE COURT: Now you've got a motion for ...

MR. PURCELL: To appoint an expert witness to examine evidence of the State, Your Honor.

. . . .

MR. PURCELL: What he seeks to do here, Your Honor, is to have one of his experts to go over everything and run all the tests and do that sort of thing. I believe he has—

THE COURT: That's already been done?

MR. PURCELL: Yes, sir. It's already been done, which will be introduced at trial and I know the Court is familiar with recent Georgia cases in which defense counsel of various defendants have sought to have so-called criminologists appointed and Martin against the State is the most recent one—

THE COURT: The Courts haven't gone that far yet, have they?

MR. PURCELL: No, sir.

MR. WILKINSON: If I could respond to Mr. Purcell's argument, I believe my motion sets out the reasons for the need to have an independent expert appointed to examine the evidence by the State, because the whole theory of the defendant's case rests upon the examination and introduction into testimony, evidence derived from the examination and to leave the entire defense to the prosecution, and admittedly, the Georgia Bureau of Investigation Crime Bureau is an arm of the State, to leave the entire defense theory, the entire examination of the evidence to the State, would deny to the defendant due process of law. I don't want to tell the State what our theory of the case is, but our theory of the case depends a great deal upon the examination of this evidence, and I'm not an expert—I can go in there and I can look at something and I can't determine whether or not the trajectory of fire which the State says may have occurred is in fact what occurred. I ask the Court to appoint a qualified expert who has had a lot of experience in this area to examine the evidence and to see if that corresponds with what the State says, or it corresponds with my theory of the de-

fied ballistics and firearms expert, to examine the ballistic and firearm evidence in possession of the State, and respectfully shows the Court the following:

1. That Defendant has been charged in Indictment Number 44, January Term, 1979, with the offense of murder and aggravated assault.

2. That Defendant is indigent and has no money or property with which to pay an expert witness.

3. That an unknown quantity of evidence is now possessed and is being processed by the Augusta branch of the State Crime Lab, and much of this evidence concerns ballistic tests, trajectory patterns of various bullets, firearms examinations, reconstruction of window glass from the deceased's automobile, paraffin tests, and other similar and related evidence.

4. That Defendant is entitled to have an independent expert appointed to examine the evidence in possession of the State Crime Lab to determine whether or not the deceased, Larry Stevens, fired his service pistol prior to his death, the paths of the bullets fired by the deceased, the number of bullets which were fired from both the deceased's pistol and allegedly from the rifle of Defendant, the sequence of firing of various weapons, the implosion or explosion of glass from the vehicle of the deceased, and an examination of the bullets to determine from whose weapon they were fired.

5. That Defendant is entitled to have an independent expert appointed because to do otherwise would leave the only expertise at trial to the State Crime Lab, an admitted arm of the District Attorney, who will not allow Defendant's counsel to review the evidence, and would deny to Defendant the right to a fair trial and due process of law, guaranteed him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

6. That to deny Defendant an independent expert, appointed and paid for by Richmond County, while allowing the same expert to be appointed if paid for by the Defendant, would deny to Defendant, an indigent, the equal protection of the law guaranteed him by the Fourteenth Amendment to the United States Constitution.

7. That the resume' of Otis Hensley is attached hereto as Exhibit "A".

8. That Defendant's Affidavit of Poverty is attached hereto as Exhibit "B".

WHEREFORE, Defendant prays the Court appoint Otis Hensley as an independent expert ballistics and firearms examiner to have him paid at county expense, and to allow him to examine the evidence against Defendant which is in the possession of the State Crime Lab.

fense and even though the evidence has been examined—

THE COURT: Excuse me. Even though I might consider doing that, where in the world would I find such a man other than the [sic] would have?

MR. WILKINSON: Your Honor, that's why I suggested the Court appoint Otis Hensley. Of course, I attached his resume that he's a qualified firearms examiner, expert witness and has—

THE COURT: Where's Mr. Hensley located.

MR. WILKINSON: He lives in Columbia County, Judge.

. . . .

MR. WILKINSON: Your Honor, ... I think due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States require that the sole—well, the State not have control over the entire case to the exclusion of any witnesses that the defendant might introduce, and of course the defendant is indigent, and of course has no funds other than say, through the grace of the Court, by which to employ an expert to examine the evidence.

THE COURT: I'm sure you know, Mr. Wilkinson, the Court's at a real disadvantage here now, because I've had no opportunity even to see this before. You've had opportunity to look into all of this and you've been there and been to the Crime Lab and you went there and got all the information you could and I haven't seen the file. I'm going to make an in camera inspection and if I find or see anything that indicates there might be something exculpatory, I'm going to have the district attorney review it with you. Then, if there is anything that develops that I think requires necessity of an expert other than what we already have, I'll consider that further, but I think we'll have to wait until that time and adjust my thoughts.

Additional comments by the trial judge indicate that he had made an in camera inspection of the prosecutor's file prior to ruling upon the motion for appointment of an expert. The prosecutor's file has not been made part of the record in this habeas corpus proceeding. On January 11, 1980, Judge Pierce denied the defendant's motion for appointment of an expert. This motion was never reasserted during the course of Stephens' trial.

The record therefore shows that the trial judge had the following information before him at the time he ruled upon defendant's motion: (1) petitioner's indictment, (2) petitioner's written motion before the court, (3) defense counsel's oral argument at the motions hearing of January 8, 1980, and (4) the prosecutor's file in this case. The record also shows that defense counsel was given the opportunity to review the physical evidence in the prosecutor's possession.

In light of this Court's en banc decision in *Moore v. Kemp*, we conclude that the state trial court was presented with "little more than undeveloped assertions that the requested assistance would be beneficial." *Caldwell*, 472 U.S. at 323 n. 1, 105 S.Ct. at 2637 n. 1. In considering the evidence before Judge Pierce, we must be mindful of the fact that "the determination of whether an expert is necessary to help the jury in a particular case is more difficult before or during trial than is the hindsight appellate determination." Note, *Criminal Procedure: The Constitutional Extent of the Adequate Tools of a Defense*, 39 Okla.L. Rev. 273, 285 (1985).

In this case, the trial court was informed: (1) that the defendant desired funds to retain a ballistics expert to determine whether Officer Stevens had fired his gun and the path those shots would have taken, (2) the defendant contended that the Georgia Crime Lab constitutes "an admitted arm of the District Attorney" and therefore could not be trusted to perform the tests, and (3) that Otis Hensley would accept appointment as the defendant's ballistics expert if funds were made available. Stephens never informed the court of the type of testing which could be performed. Although Stephens was arrested, charged, and afforded court-appointed counsel within one week of the murder, the request for appointment of an expert did not occur until one year later. At a minimum, counsel should have in-

formed the court whether physical testing of the evidence could have been conducted one year after the fact.[2] Furthermore, Judge Pierce was never informed as to what an expert could be expected to contribute to the defense. The information before Judge Pierce indicates that Stephens desired an expert merely to attack the credibility of the state's witnesses. The defendant's written motion and oral argument emphasize the defense contention that the state's experts cannot be trusted rather than emphasizing what type of testing would be necessary to facilitate the truth-seeking function of the court. Here, the prosecution had no witness who had participated in the fatal transaction and necessarily relied upon the opinion testimony of experts. Under these circumstances, the state is not required to appoint identical experts on behalf of the defendant to even the score. If *Ake* does indeed stand for the proposition that a defendant is entitled to state provided experts in cases involving other than the arcane issue of sanity *vel non*, it cannot be interpreted as requiring the appointment of a ballistic expert in every case in which a gun has been discharged. At most, *Ake* could only be viewed as requiring the appointment of an expert upon a showing that the issue upon which the expert will testify inherently requires expertise for its resolution and is a significant factor at trial. No such showing has been made in this case. The district court therefore properly concluded that Stephens was not entitled to relief on this issue.

Furthermore, the district court properly concluded that Stephens' trial was not rendered fundamentally unfair by the state's failure to appoint a ballistics expert. The district court aptly noted:

> Petitioner acted well beyond the bounds of self-defense. He shot at the victim three times at close range with a high-powered rifle. The third and fatal shot, observed by the eyewitness, "was deliberate and inflicted only after the officer was lying helplessly in his automobile,

seriously wounded." *Stevens [sic] v. State*, 247 Ga. at 709, 278 S.E.2d at 408.

In light of the overwhelming evidence that Stephens did not act in self-defense, the expert testimony sought by the defendant would not have affected the outcome of the trial. Even if the defense counsel were capable of establishing that the victim fired the first shot, expert testimony could not have refuted the testimony of the eye-witnesses who observed Stephens slowly walk to the rear of the victim's squad car, raise the rifle to shoulder height, and calmly fire the final shot as the victim lay sprawled across the front seat of his patrol car. Accordingly, the district court properly rejected Stephens' claim for relief.

## II. The Claim to An Evidentiary Hearing to Introduce Psychiatric Testimony

Appellant also argues that the district court erred in refusing to afford him an evidentiary hearing at which he would have presented psychiatric testimony concerning his allegedly diminished mental capacity. Appellant wished to offer this testimony in support of the claim that his trial counsel provided him with constitutionally inadequate assistance of counsel by, *inter alia*, failing to investigate more thoroughly and present evidence concerning appellant's mental condition (1) as part of an insanity or other diminished responsibility defense that he should have asserted at trial, and (2) as a mitigating circumstance in the penalty phase of the proceedings. As we conclude in Part III below, however, it is clear from the record already before the court that trial counsel's failure to seek additional psychiatrist assistance or otherwise further investigate appellant's mental condition before trial for the purpose of presenting an insanity or other diminished responsibility defense at trial did not deny appellant the effective assistance of counsel in the guilt phase of the trial. Because the evidence appellant seeks to introduce could in no way affect our conclusion in

---

**2.** Stephens' habeas corpus petition contends that the deceased officer's hands should have been tested for gun powder to determine if he had

fired his service revolver. The difficulty of conducting such testing one year after his death speaks for itself.

this regard, he is not entitled to an evidentiary hearing in the district court to support his claim of ineffective assistance of counsel in the guilt phase of his trial. *See Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756–57, 9 L.Ed.2d 770 (1963). We also decide in Part III below, on the basis of the record already before the court, that appellant did not receive constitutionally adequate representation in the sentencing phase of the proceedings. Because we are able to determine the merits of appellant's ineffective assistance claims on the basis of the record already before the court, the district court did not err in denying a hearing for the taking of additional evidence in support of those claims.

### III.  *The Ineffective Assistance of Counsel Claims*

█ In our consideration of appellant's ineffective assistance of counsel claims, we are met at the outset of our analysis by a threshold question presented by the state's cross-appeal. According to the state, the trial court erred in refusing to find petitioner's ineffective assistance of counsel claim barred on federal habeas by the Georgia habeas court's finding on appellant's second state habeas petition that the claim could not be raised then for the first time in state court under Georgia's successive habeas petition statute. *See* O.C.G.A. § 9–14–51. The state argues that state law successive petition rules should operate to preclude the presentation on federal habeas of claims that were not entertained on state habeas because they were first raised in a second state habeas petition and could have been raised in the first petition filed in state court. For the reasons set forth below, we hold that the district court did not err in declining to enforce this asserted procedural bar.

As previously indicated, appellant was represented in his first state habeas proceeding by the attorney whose assistance at trial was subsequently claimed to have been ineffective in his amended federal habeas petition. That petition was dismissed by the district court on exhaustion grounds. Appellant then presented his unexhausted claims of ineffective assist-

ance of counsel to the state courts in a second state habeas petition. The ineffective assistance of counsel claims were held barred in state court under Georgia's successive habeas corpus petition statute because they could have been raised in appellant's original state habeas petition. The state argues that the procedural bar imposed in state court should be applied in federal district court as well, relying on the principles expressed in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 33 L.Ed. 2d 594 (1977), and *Ford v. Strickland,* 696 F.2d 804 (11th Cir.) (en banc), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). Citing *Francis v. Spraggins,* 720 F.2d 1190, 1192 n. 3 (11th Cir.1983), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985), the district court declined to extend the doctrine of *Wainwright v. Sykes* in the manner urged by the state.

We conclude that the district court properly entertained petitioner's claim on the merits. This court has recently held that the *Wainwright v. Sykes* cause and prejudice test applies to claims barred in state collateral attack proceedings. *See Presnell v. Kemp,* 835 F.2d 1567 (11th Cir.1988). We find "cause" for petitioner's failure to raise the ineffective assistance issue in his first state habeas petition in the fact that petitioner's trial counsel, whose effectiveness is here challenged, also represented him in the first state habeas proceeding. *See Alston v. Garrison,* 720 F.2d 812 (4th Cir.1983). Moreover, as our resolution of the merits of this claim indicates, counsel's failings caused petitioner to suffer an "actual and substantial disadvantage," thus constituting the "prejudice" that, under *Wainwright v. Sykes,* must be established before a procedurally defaulted claim may be heard by a federal habeas court. *See United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982). The district court therefore properly entertained petitioner's ineffective assistance claim on the merits.

█ On the merits of his ineffective assistance of counsel claim, appellant argues that his trial counsel was ineffective in

numerous respects in his investigation and conduct of appellant's defense.[3] The district court held an evidentiary hearing at which trial counsel testified at length concerning the steps he took in preparing and presenting appellant's defense. The district court concluded that trial counsel's representation was without question reasonably effective under the circumstances and was in many respects exemplary. We agree with the district court's resolution of this issue to the extent the court determined appellant not to have received constitutionally inadequate assistance of counsel in the guilt phase of the proceedings. Trial counsel's representation was indeed outstanding in many important respects, and we find no basis in the record or the additional facts alleged concerning appellant's mental condition for concluding that trial counsel's decisions about how he would prepare and present appellant's defense in the guilt phase of the trial were unreasonable.

■ We find troubling, however, certain aspects of trial counsel's preparation and presentation of appellant's case in the penalty phase of the proceedings. Our reading of the record convinces us that, under the circumstances of this case, trial counsel's failure to investigate, present and argue to the jury at sentencing any evidence of appellant's mental history and condition constituted error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). We recognize that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

time." *Id.* 104 S.Ct. at 2065. Such an assessment leads us ineluctably to the conclusion, however, that appellant has met the requirement imposed by the first prong of the *Strickland v. Washington* test. Turning to the second prong of that test, we further conclude that there is a reasonable probability that, if not for counsel's omissions in the representation he provided his client in the penalty phase, the result of the sentencing proceeding would have been different. *See id.* 104 S.Ct. at 2068–69. Because appellant has met both requirements imposed upon him by the *Strickland v. Washington* test, we reverse the decision of the district court insofar as the court held that appellant received constitutionally adequate representation at the sentencing phase of the proceedings.

Appellant's trial counsel was first contacted to determine whether he could replace appellant's original appointed counsel on February 7, 1979, two days before appellant's scheduled arraignment, and two days after the trial court had ordered a psychiatric evaluation of appellant upon the joint request of the state and appellant's original counsel. In his conversations with his predecessor in the case, trial counsel apparently was not made aware of the pending psychiatric examination and thus did not know why it had been requested. The record does not reveal the reason the examination was sought.

Shortly after his appointment, however, trial counsel learned from appellant's sister that appellant had spent a brief period of time in a mental hospital sometime between four and six months before the shooting occurred. On the basis of that information, trial counsel filed his own motion to have appellant examined to determine his competency to stand trial and to inquire into any insanity defense that

---

**3.** Appellant argues strenuously that trial counsel failed to conduct an adequate investigation into appellant's mental condition and history and present important evidence thereof at trial. Appellant also claims trial counsel rendered ineffective assistance by (1) failing to object to inadequate instructions on mitigating circumstances; (2) failing to seek adequate jury instructions in the penalty phase; (3) failing to object to the

prosecutor's closing argument in the penalty phase; (4) failing to investigate, prepare for and present an adequate case in the penalty phase; (5) failing to seek the appointment of a pathologist or a psychiatrist to assist him in his defense; (6) failing to cross-examine the state's experts effectively at the guilt phase; and (7) failing to *voir dire* venirepersons adequately.

might have been available to him. Trial counsel withdrew that motion upon learning of the actions that had already been taken in that regard. The trial court ordered the psychiatrist who was to examine appellant to file a written report concerning appellant's competency to stand trial and his degree of criminal responsibility for his acts. The psychiatrist's report concluded that appellant was competent to stand trial, and the psychiatrist found the following with respect to appellant's overall mental condition at the time of the examination:

In summary, I can find no evidence of severe mental illness at the present time or indication at the present time that he has suffered a severe mental illness of a functional nature in the recent past. It is, therefore, my opinion that I can find no evidence of a mental disability or disorder to indicate reduced capability in connection with any alleged recent act or any evidence of a compulsion existing which would overmaster one's will to resist committing an alleged act.

The psychiatrist's written evaluation includes the following reference to appellant's brief period of hospitalization: "Past history indicates that he was once in a mental hospital, Georgia Regional Hospital at Augusta, for a few days approximately four to six months ago. He was vague and does not give a clear reason why he was in the hospital at that time."

On the basis of this written evaluation of appellant, trial counsel elected to pursue his investigation into appellant's mental condition no further. He did not inquire of anyone what had precipitated appellant's five day hospitalization at Georgia Regional Hospital, nor did he examine the hospital records to determine the diagnosis or the reason appellant had been hospitalized. In preparation for the penalty phase of the trial, trial counsel thus conducted no inquiry whatsoever into the possibility of presenting evidence of appellant's mental

history and condition in mitigation of punishment. As a result, trial counsel learned none of the details of appellant's mental history until his mother testified briefly at the penalty phase concerning several episodes of bizarre behavior and the fact that he had spent time in a mental hospital following one such incident, and counsel failed to argue any of those facts to the jury in mitigation at the penalty phase.[4]

Trial counsel's reliance upon the psychiatrist's written evaluation was reasonable insofar as the guilt phase of the proceeding was concerned, and we find no failure of counsel in that regard. Where no capital sentencing proceeding will follow the guilt phase of a trial, such a decision not to pursue a defense of lack of criminal responsibility is not "outside the wide range of professionally competent assistance." *Strickland v. Washington,* 104 S.Ct. at 2066. But when a capital sentencing proceeding is contemplated by counsel aware of the facts of which appellant's trial counsel was aware, professionally reasonable representation requires more of an investigation into the possibility of introducing evidence of the defendant's mental history and mental capacity in the sentencing phase than was conducted by trial counsel in this case. Although trial counsel was aware well in advance of trial that appellant had spent at least a brief period of time in a mental hospital shortly before the shooting, and that for some reason a psychiatric evaluation had already been ordered, he completely ignored the possible ramifications of those facts as regards the sentencing proceeding. This omission denied appellant reasonably competent representation at the penalty phase.[5]

Further, the resulting prejudice is clear. The only testimony the jury heard at sentencing concerning appellant's mental history and condition, including the bizarre behavior he occasionally exhibited, was

---

4. We note that the mother's testimony in this regard was presented after trial counsel had apparently concluded his examination of her, in response to an inquiry directed at her by the trial court judge. For the testimony she presented, *see infra* note 5.

5. We reached a similar conclusion in *Thompson v. Wainwright,* 787 F.2d 1447 (11th Cir.1986), but we found no prejudice resulting from counsel's errors in that case.

that which was presented by his mother.[6] As her testimony makes clear, many others could have testified concerning his behavior; the fact that others did not do so undoubtedly diminished the impact on the jury of the facts she described.[7] We note additionally that trial counsel's closing argument in the penalty phase included no mention of the comments made by appellant's mother concerning his behavior and

**6.** The state trial court transcript reveals the following colloquy between the trial court judge and appellant's mother:

> THE COURT: Mrs. Stephens [sic]—I want to ask her a question. I know it's difficult for you to talk, I know it's difficult, and you're not used to being on the stand in front of a lot of people; it would be difficult for me to talk. I know it's difficult for you to talk in these circumstances. But now is the time, if there is anything that you would like to bring before this jury that they need to know about your son in helping them make their decision, and they're being called on to make a terribly important decision, a serious decision, and one that has long lasting eternal consequences, and I want you to—I want you to take this opportunity, as difficult as it may be, to tell this jury anything and everything that you have on your mind and in your heart about your boy, and do it now.
>
> A. About a year ago, my son—my daughter called me and told me to come over to her house, that something was wrong with him, said he wasn't doing nothing but walking up and down the street until midnight every night. And I had to go over there and get him and carry him back home. It looked like he was losing his mind. He was out there on Tobacco Road and they had him down there in the jail; I used to go down there to see him. They were fixing on the courthouse down there on 4th Street and they had him out there on Tobacco Road. A couple times I went there, they had him down in a cell. They said I couldn't see him because he was—something was wrong with him. So I asked them to carry him back out there where I had him at the Regional, but they said I couldn't do that because—I had to go talk to somebody about it, so I talked to a couple of peoples [sic] over there about it, and they wouldn't let me carry him back over there. I don't know why they didn't do that.
>
> THE COURT: Carry him back over where, to Regional?
>
> A. To Regional. Yes, sir, he stayed over there about two weeks. Off and on, right now, it looks like his mind goes and comes. And I don't know, but it seems like two or three times they wouldn't let me see him because they said that he wasn't up to seeing nobody at that time. He'd just sit down in the room to hisself [sic].
>
> THE COURT: Are you talking about him since he had been in ...
>
> A. In—in prison.
>
> THE COURT: ... in prison, awaiting trial?
>
> A. Yes, sir.
>
> THE COURT: Go ahead.
>
> A. So—a heap of times I went there and talked to him down there, and then he don't do nothing but sit down and stare at the wall and be quiet. I'd say, "What's wrong with you Kenny?" He'd say, "Nothing, don't you see something up there?" I'd say "I don't see nothing." He'd say, "I see y'all with the TV there about every night." He'd say "I don't even watch TV." He'd say, "I have a little son, I see him every night on TV." I'd say, "You don't see us on TV at night." I'd say, "What's wrong with you?" He'd say, "Yeah, I do, too, 'cause I don't want to watch it." He'd say, "I don't watch it." And he used to say a lots of things like that. He was working with Sunbeam and he drove his truck way up in Harlem. He said he was going to the crossroads because the Lord had called him to come over. And he got out of the car and went walking. The police picked him up there in Harlem and put him in jail, and they called me. And I went up there about 5:00 o'clock that morning, and they said, "Your son was walking up and down the street just like he's crazy." And they said he got out of a Sunbeam truck and they said, "Is it stolen?" And I said, "No," I said, "he's not stole it." They said when they found it it had give out of gas. I asked him where—where he was going? He said, "I don't know." He said 'cause the Lord had done called him to come to the end of the world, and "I was going over, and I saw white lamb's shoes." I don't know what all he didn't told me he saw. And I had to go up there and pay—I had to pay $30.00 to get him out of jail, and then I brought him on home. And that night—he stayed around the house as long as I was there, and when I left, then I got another call saying, "Come on, Mama, let's go get Kenny, he's walking the streets again." He just walked and walked, bare feet. He had blisters on his feet from walking. So I don't know what happened to him. So I just thought if y'all see in your heart—don't kill him, that's all.

**7.** In his closing argument in the penalty phase, the prosecutor discounted appellant's mother's testimony as follows:

> I'm not going to spend a lot of time talking about Mrs. Stephens' testimony because you just heard—heard what I heard, it was pretty sad. It's always sad when you have a mother. Parents always suffer for the crimes of their children. Now, it's a little bit sad, too, that of all the people this man has come in contact with in 33 years, they could only find one to get on the stand and say anything good about him, his mother. And I guess we can expect mothers to say something good. They love us no matter how badly we disappoint them; no matter how bad or how rotten we may be, they always love us. It's great.

mental condition. In light of the way they came in, arguing those facts to the jury, explaining their possible relevance, and arguing their importance as mitigating circumstances, may well have been futile. As a result, however, although the jury heard some testimony concerning appellant's mental condition, the jurors were left with no guidance concerning how they might take such facts into consideration in mitigation of punishment. Taking into consideration any evidence or argument the state might conceivably have produced in rebuttal, we are convinced that there is a reasonable probability that, but for counsel's omissions, the result of the sentencing proceeding would have been different. *Strickland v. Washington,* 104 S.Ct. at 2068. Appellant has met both requirements imposed by the *Strickland v. Washington* test. We therefore conclude that the writ must be granted insofar as the penalty of death is concerned, subject to the holding of a new sentencing proceeding within a reasonable period of time to be set by the district court.

## IV. *The Witherspoon/Witt Claims*

Appellant also argues that the exclusion of four venirepersons from the jury panel for cause violated his sixth amendment right to be tried before an impartial jury under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).[8] Before *Witt* was decided, most courts, including the district court in this case, applied the test approved in footnote 21 of *Witherspoon* to determine whether a juror had properly been excluded for cause. Under that test, jurors could be excluded for cause if they made it

> unmistakably clear (1) that they would *automatically* vote against the imposi-

tion of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original). In *Witt,* however, the appropriate standard was clarified to provide that a juror could be excluded for cause because of his or her views on capital punishment if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt,* 105 S.Ct. at 852. This formulation dispenses with *Witherspoon's* reference to "automatic" decisionmaking, and does not require that the juror's bias be proved with "unmistakable clarity." The Supreme Court explained its modification of the *Witherspoon* standard as follows:

> This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.

*Witt,* 105 S.Ct. at 852 (footnote omitted). The Court further held that, on a petition for habeas corpus pursuant to 28 U.S.C. § 2254, the state trial court's determination that a prospective capital sentencing juror should be excluded for cause is a "factual issue" to which 28 U.S.C. § 2254(d)'s "presumption of correctness" applies.[9]

---

**8.** Appellant's initial brief was filed before *Witt* was decided. In his reply brief, however, appellant was able to address the bearing *Witt* has on this case.

**9.** 28 U.S.C. § 2254(d) provides as follows:

    In any proceeding instituted in a Federal court by an application for a writ of habeas

corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reli-

Applying the standard set forth in *Witt* to the facts of this case, we find no violation of appellant's sixth amendment rights. Appellant's strongest claim of improper exclusion for cause, and the only one he pursued in his briefing on this issue following the Supreme Court's decision in *Witt,* concerns the trial court's exclusion of juror Thomas L. Clark. After indicating at the outset of voir dire that he was conscientiously opposed to capital punishment, juror Clark indicated in single word responses to the trial court's inquiries that (1) his reservations about capital punishment would not prevent him from making an impartial decision concerning the defend-ant's guilt, (2) it was not the case that he could never vote to impose the death penalty, and (3) he would not refuse to consider its imposition in the case before him.[10] He was then asked by the trial court judge if he was "irrevocably committed before the trial [had] begun to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of [the] proceedings," to which he responded "Yes." Defense counsel was then permitted to examine juror Clark as follows:

THE COURT: Your name is Thomas L. Clark?

THE JUROR: Yes, sir.

able and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject mater or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

10. Juror Clark was initially questioned along with another juror as follows:

THE COURT: Are you, or any of you, conscientiously opposed to capital punishment? All, right, your name, please, ma'am?

A JUROR: Katherine Farr, F-A-R-R

THE COURT: And, yes, sir?

ANOTHER JUROR: Thomas L. Clark.

THE COURT: Please remain standing. Thomas L. Clark. Did all of you understand that question: Are any of you conscientiously opposed to capital punishment? Is there any misunderstanding in the mind of anyone of what I mean by capital punishment? No indication. Please remain standing while I ask you several more questions, these two. Would your reservation—and the questions are asked of both of you—would your reservations about capital punishment prevent you from making a impartial decision as to the defendant's guilt?

MRS. FARR: I would think so.

MR. CLARK: No.

THE COURT: It would not, Mr. Clark said. Are your reservations—the question again is directed to both of you—are your reservations about capital punishment such that you could never vote to impose the death penalty? Mr. Clark?

MR. CLARK: No.

THE REPORTER: What was her reply?

THE COURT: Her reply was "Yes." Again, a question to both of you, Are your reservations about capital punishment such that you would refuse even to consider its imposition in the case before you?

MRS. FARR: I wouldn't consider it.

MR. CLARK: No.

BY [DEFENSE COUNSEL]:

Q. Mr. Clark, if this trial gets to the penalty phase, the issue to be considered would be whether the Court would impose the penalty of death or a penalty of life imprisonment. At that point, evidence will be offered on the issue of punishment. The Court will then charge you the law on the issue of punishment. Would you be willing to consider all the evidence and the law before reaching a verdict?

A. I will answer this way. It's my religious conviction: I cannot give a life, and I do not take a life.

Q. All right, sir, if the law charged to you that you must consider is that regardless of the facts of the case, under no circumstances must you impose a death penalty—under no circumstances must you impose a death penalty, do you then believe that you could consider the facts of the case from the evidence presented, look at it, deliberate it, and vote what you feel ought to be done?

A. Yes.

Following legal argument, the trial court then excused juror Clark for cause, explaining its decision as follows:

THE COURT: Let me tell you how I view this. He has stated in response to my first question that he is conscientiously opposed to the death penalty. He has said his reservations about capital punishment would not prevent him from making an impartial judgment as to the defendant's guilt. He also said that his reservations about capital punishment were such that—were not such that he could never vote to impose the death penalty which puzzled me a bit. Then he finally says that he is irrevocably committed, before this trial—before this case is begun, before he has heard any evidence, to vote against the penalty of death regardless of the facts and circum-

stances that might emerge in the course of the proceedings. I think he is disqualified.

This clearly constituted a "finding" sufficient to invoke the presumption of correctness of section 2254(d), *see Witt*, 105 S.Ct. at 855–56, unless one of the statutorily enumerated reasons for avoiding the presumption is present in this case. Appellant has suggested only that "the record is wholly insufficient to satisfy even the *Witt* test," at least as regards the exclusion of juror Clark. We disagree with this assertion. Although juror Clark's responses were inconsistent, the trial court's determination, measured against the *Witt* standard, is without question "fairly supported by the record." 28 U.S.C. § 2254(d)(8). This places upon appellant the burden of establishing "by convincing evidence" that the exclusion of juror Clark was erroneous. 28 U.S.C. § 2254(d). Appellant has not so demonstrated that juror Clark's views would not "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 105 S.Ct. at 852. We therefore find no error in the district court's determination that juror Clark was not improperly excluded for cause. We likewise agree with the district court that the exclusion of the other three jurors appellant claims were improperly excluded did not violate appellant's constitutional rights.[11]

*Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) disposes of appellant's argument that the exclusion of jurors opposed to the death penalty violates his constitutional right to a jury representing a fair cross-section of the community.

## V. *The Sandstrom/Franklin Claim*

Appellant's fifth contention is that his constitutional rights were violated during the guilt phase of the trial is that the trial court's charge to the jury impermissibly

---

11. We need not reproduce the lengthy voir dires of jurors Parkman and Hall, as we find no plausible basis for challenging their exclusion for cause under *Witt*. The entire *voir dire* of juror Farr, along with part of the *voir dire* of juror Clark, is reproduced *supra* note 10.

Her exclusion for cause on the basis of her responses to the trial court's questions was entirely appropriate under *Witt*, and the trial court was under no obligation to permit defense counsel to question her in an attempt to persuade the court otherwise.

shifted to appellant the burden of proof on malice and intent in a manner that cannot be considered harmless beyond a reasonable doubt. The challenged portion of the trial court's charge to the jury reads as follows:

Members of the Jury, I charge you that a person commits murder when he unlawfully and with malice aforethought, either express or implied, caused the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart. Before you would be authorized to find the defendant guilty of the offense of murder, you must find and believe beyond a reasonable doubt that the defendant did with malice aforethought, either express or implied, cause the death of Larry W. Stevens, Sr.

I charge you that if you find and believe that at any time prior to the date this indictment was returned into this court that the defendant did in the County of Richmond, State of Georgia, with malice aforethought kill and murder Larry W. Stevens, Sr., in the way and manner set forth in the indictment, then you would be authorized to find the defendant guilty of murder. Members of the Jury, I further charge you in that regard that malice in its legal sense is not necessarily ill will or hatred. It is the unlawful, deliberate intention to kill a human being without justification or mitigation or excuse, which intention must exist at the time of the killing. It is not necessary, however, that this unlawful, deliberate intention should exist for any particular length of time before the killing. If it enters the mind of the slayer the moment before he fires the fatal shot, or strikes the fatal blow, or inflicts the fatal wound, that is sufficient.

Members of the Jury, the law presumes that a person intends to accomplish the natural and probable consequences of his acts. If a persons uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily employed to produce death and thereby causes the death of a human being, the law presumes the intent to kill. This is and always shall be in a trial of this case a rebuttable presumption; the presumption may be rebutted. I further charge you that a person shall not be presumed to act with criminal intention, but the triers of the facts may find such intention upon consideration of the words, conduct, demeanor, and all other circumstances connected with the acts for which the accused has been prosecuted. The burden has always, it has always rested, and continues to rest upon the State to prove the act alleged to be criminal is in fact a criminal act beyond a reasonable doubt.

In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that the jury instructions in that case deprived a criminal defendant of due process because they were reasonably susceptible of an interpretation that removed from the prosecution the burden of proving every element of the crime beyond a reasonable doubt. Having undergone considerable development (and some extension, *see e.g., Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)) since *Sandstrom* was decided, the law we apply to determine the constitutionality of the charge at issue in this case is now clear. *See Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985) (en banc); *Tucker v. Kemp*, 762 F.2d 1496 (11th Cir.1985) (en banc). We have recently described the test to be applied in this circuit as follows:

To determine whether the judge's instructions in this case thus infringed the constitutional rights of the petitioner, we must consider first, whether the instructions concerned an essential element of the offense with which the petitioner was charged; second, whether the instructions operated to shift the burden of proof; and third, whether any error

which might have arisen from the shifting of the burden was harmless in the context of this case.

*Davis v. Kemp,* 752 F.2d 1515, 1517 (11th Cir.) (en banc), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 707 (1985). *See also Francis v. Franklin,* 105 S.Ct. 1965 (employing similar analysis).

■ We need not engage in a detailed inquiry into whether the charge quoted above reveals a *Sandstrom* violation, as binding precedent supplies the answer. Both intent and malice are essential elements of the crime of murder in Georgia, so that a *Sandstrom* error may be found with respect to either one.[12] *See Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 S.Ct. 496 (1983); *Mason v. Balkcom,* 669 F.2d 222 (5th Cir. Unit B 1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983); *Holloway v. McElroy,* 632 F.2d 605 (5th Cir.1980), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981). Our cases establish clearly that the charge given in this case did not impermissibly shift the burden of proof on malice. The charge is no more suggestive of a mandatory presumption of malice than the charge given in *Collins v. Francis,* 728 F.2d 1322 (11th Cir.1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984). In that case we held that the charge did not shift the burden of proof on malice. *See also Lamb v. Jernigan,* 683 F.2d at 1340. Just as clearly, however, the instruction given in this case must be held to have impermissibly shifted the burden of proof on the essential element of intent to kill. The rebuttable mandatory presump-

tion of intent established in the final paragraph of the instruction quoted above, even when read in conjunction with the remainder of the charge, is no less burden-shifting than the presumptions condemned in *Francis v. Franklin,* 105 S.Ct. at 1972–77, and *Davis v. Kemp,* 752 F.2d at 1517–19. *See also Drake v. Kemp,* 762 F.2d at 1453.

We thus proceed to a consideration of whether the *Sandstrom* error found in the charge to the jury constitutes harmless error under the particular circumstances of this case. *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 400 (1986). Our cases have established that a *Sandstrom* error may be held harmless in either of two situations: (1) where the evidence of the defendant's guilt, or the satisfaction of the burden the prosecution should have borne on the element of the crime on which the burden was improperly shifted, is overwhelming; or, (2) where the instruction concerns an element of the crime not at issue in the trial. *See generally Davis,* 752 F.2d at 1520–21; *Brooks,* 762 F.2d at 1390–94; *Drake,* 762 F.2d at 1453–57; *Tucker,* 762 F.2d at 1501–03. As our recent en banc cases make clear, where the burden of proof has been improperly shifted on intent, the inquiry under the first prong of the harmless error test should ordinarily focus on whether there exists overwhelming evidence of intent, rather than the more inclusive question of guilt. Under the second prong of the test, a *Sandstrom* error on intent may be held harmless where intent to kill is conceded by the defendant or is not at issue in the trial as a matter of state criminal law.

**12.** Appellant fails to distinguish between malice and intent, as most courts have, for purposes of determining whether a *Sandstrom* error has been made and, if so, whether it was harmless beyond a reasonable doubt. Appellant may have chosen to fuse the two elements because his petition for habeas corpus only alleged an impermissibly burden-shifting instruction with respect to malice, and did not discuss intent. In his brief in support of the petition, however, appellant quoted the language of the charge concerning intent that we have examined for a *Sandstrom* error and appellant noted that in *Sandstrom,* "the Supreme Court held that a similar instruction could be interpreted either as a conclusive presumption or as a burden-

shifting presumption." *Sandstrom,* of course, concerned a burden-shifting instruction on intent that was quite similar to the instruction on intent that is at issue in this case. The district court apparently considered a *Sandstrom* challenge to the intent language of the charge to have been properly raised, as it passed on the charge on intent separately from its consideration of the portion the charge concerning malice. Appellee addressed those issues on the merits similarly on this appeal, raising no claim of procedural default concerning any errors in the trial court's charge on intent. We therefore find appellant's constitutional challenge to the intent language of the charge to be properly before us on this appeal.

In this circuit, failure to dispute an essential element of the crime does not operate automatically to remove the issue entirely from the jury's consideration at trial and render a *Sandstrom* error on the element harmless under the second prong of the test described above. *See Davis*, 752 F.2d at 1521; *Tucker*, 762 F.2d at 1501–02. Further, defending on the grounds of self-defense does not alone necessarily constitute a concession of intent to kill. *See Mason v. Balkcom*, 669 F.2d 222.[13] But the defendant's defensive posture in a particular case may remain an important factor in the harmless error analysis even if the defense does not as a matter of law concede or remove from the jury's consideration the element on which

the burden has been impermissibly shifted. We have previously noted, for example, that where an issue is not disputed by the defendant at trial as part of his defense, the evidence on that issue may be more easily found to be overwhelming under the first prong of the harmless error test set forth above. *Davis*, 752 F.2d at 1521; *Tucker*, 762 F.2d at 1501–02.[14]

The defense offered at trial, when considered in conjunction with the jury's verdict, may affect the harmless error inquiry in other respects as well. Turning to the particular defense raised in this case, the jury's rejection of appellant's claim of self-defense, under instructions that were adequate insofar as that defense was concerned,[15] necessarily narrows the inquiry

13. In *Mason* we discussed the relationship between a claim of self-defense and the element of intent to kill as follows:

> Apparently, the district court believed that by raising self-defense the defendant admitted having the intent to kill. This analysis is too broad. When claiming self-defense, one does not necessarily admit intent to kill, but rather admits that the killing occurred. As the petitioner points out in his brief, one can shoot to kill in self-defense, shoot to wound in self-defense, shoot to frighten in self-defense, or even shoot reactively in self-defense with no specific purpose. The mere raising of self-defense clearly does not establish that the defendant had the intent to kill.

> *Mason v. Balkcom*, 669 F.2d at 227.

14. This was stated in *Tucker* as follows:

> The *Davis* case emphasized that the nature of the defense at trial is an important factor in the harmless error analysis. *Davis*, 752 F.2d at 1521. In *Davis*, as here, the thrust of the defense was the defendant's non-involvement, and the defense made no effort to rebut the evidence that the killing which had taken place was intentional. While intent remained at issue in the sense that it was not conceded and the burden of proof remained on the state, the *Davis* court expressly considered as important the fact that the defense did not contest the issue of intent, thus leaving unrebutted the overwhelming evidence that the killing was intentional. Accordingly, although Tucker's defense posture does not by itself conclude the harmless error analysis, it is relevant to our consideration of the first prong under *Davis*, i.e., whether the evidence of guilt was overwhelming.

> *Tucker*, 762 F.2d at 1501–02 (footnote omitted).

15. The trial court charged the jury concerning the legal justification of self-defense as follows:

> Members of the Jury, I charge you that a person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat or force is necessary to defend himself against another's imminent use of lawful [sic] force; however, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily injury to himself, or a third person. A person is not justified in using force under the circumstances specified above if he initially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon his assailant; or he is attempting to commit, committing, or fleeing after the commission or the attempted commission of a felony; or was the aggressor or was engaged in a combat by agreement, unless he withdraws from the encounter and effectively communicates to such other person his intent to do so, and the other notwithstanding continues or threatens to continue the use of lawful force. I charge you that if you believe the defendant did shoot and kill the deceased as alleged in the bill of indictment, but if you believe he did so in defense of his own person against an unjustified, violent assault sought to be inflicted upon him by the deceased, then you should acquit the defendant. And I further charge you that if there were a seeming necessity to take human life, that is, if as a reasonably courageous man under the facts and circumstances as they existed, or appeared to him to exist, the defendant believed his life was about to be taken in such justified—unjustified, violent, felonious assault on his person and in good faith acted upon those fears and not in a spirit of revenge, the defendant would be justified.

> In the district court, appellant argued that the instructions given the jury on his theory of the

that we must conduct into whether the erroneous instruction on intent may have contributed to the jury's verdict of guilt. The charge given the jury in this case made clear that they could not find the defendant guilty unless they found malice, consisting of both unlawful intent and the absence of any justification for the shooting. Although we have found the instructions to the jury concerning intent to have been erroneous, the remainder of the charge required the jury to find beyond a reasonable doubt that appellant's shooting of the investigator was not justified before they returned a guilty verdict on the murder charge. The jury's verdict of guilt thus necessarily rejected appellant's claim that his actions were justified in self defense, and that finding could have been in no respect tainted by the erroneous instruction on intent. As a result, the inquiry we must conduct into whether there exists such overwhelming evidence of intent as to render the *Sandstrom* error harmless beyond a reasonable doubt consists of an inquiry into whether the jury could have entertained a reasonable doubt concerning appellant's intent to kill, given its rejection of his claim of self defense.

The evidence conclusively shows that appellant fired three shots from a high powered rifle into the stationary vehicle in which the police investigator was sitting when appellant approached. Appellant fired the first shot from a position near the left front fender of the vehicle. That shot penetrated the windshield and shattered a flashing blue light on the dashboard before fragmenting as it ricocheted. According to expert testimony presented by the state, this shot struck the investigator in the lower right forearm, fracturing both bones and thereby inflicting the first of three wounds suffered by the decedent. The defense argued that the physical evidence suggested instead that the first shot did not strike the

investigator, and that the injury to his forearm was caused by the second shot. The evidence indicates clearly that appellant fired a second shot into the vehicle through the left rear side window at a slightly downward angle, wounding the investigator quite seriously in the chest and, according to the defense, the forearm. Appellant fired a third and final shot from a standing position behind the vehicle. That bullet travelled through the rear window and the front seat of the automobile before entering the chest region of the investigator's body and causing extensive and almost immediately fatal injuries. In the course of the incident, the investigator fired six shots from his service revolver, not one of which struck appellant. Appellant claimed that the shooting was over within a few seconds of when it began, but the state presented the testimony of a letter carrier, who heard appellant's first two shots and witnessed the third, to the effect that approximately a minute passed from appellant's first shot to his last. The letter carrier testified that, as he was making his rounds, he heard a shot, and about five seconds later heard a second one.[16] He then walked to a position from which he could see what was occurring. The eyewitness testified that he then saw appellant standing calmly beside the investigator's vehicle, pointing the rifle he was carrying at the car. According to the witness, appellant stood there for ten to fifteen seconds and then walked slowly to the rear of the car, brought the weapon up to shoulder height, and fired a shot through the rear window of the vehicle.

Regardless of which version of the sequence of events we accept, it is clear beyond any reasonable doubt that appellant intended to kill the police investigator. Appellant's first two shots, fired into the investigator's vehicle from close range, without question left the shooting victim almost totally disabled. Even if petitioner was

case and on self-defense were prejudicially erroneous. On appeal, appellant has chosen not to argue those claims separately, but simply to reassert them without further argument as part of his argument that any *Sandstrom* error should not be deemed harmless beyond a reasonable doubt. We find these instructions con-

stitutionally adequate under the circumstances of this case.

16. The letter carrier, who testified that he is hard of hearing, heard only the three shots fired from appellant's louder weapon, and therefore could not testify concerning who fired first.

firing in an unreasonable or unjustified belief that force was necessary to prevent the investigator from causing him harm, petitioner's third and final shot belies any suggestion that he was firing only to prevent injury to himself and did not intend to kill. Each of the three shots was fired from a high powered rifle from such a position and in such a direction as to have killed the investigator. Our review of the record convinces us that no reasonable juror could have believed that petitioner did not intend that result.

### VI. *The Trial Court Judge's Conduct of the Trial*

Appellant also claims the trial court judge improperly interjected himself into the proceedings in violation of appellant's fifth and fourteenth amendment rights. Appellant has cited no plausible instances of misconduct in support of his claim. After reviewing the state trial court transcript, the district court concluded that the trial court judge's comments did not deprive appellant of a fair trial. Our own independent evaluation of the transcript, including in particular those instances of alleged misconduct cited in appellant's brief, leads us to reach the same conclusion as the district court. Appellant is not entitled to habeas corpus relief on this ground.

### VII. *The Constitutionality of the Georgia Death Penalty Statute as Applied*

Appellant's claim that the death penalty statute in Georgia is unconstitutional as applied to defendants who are black, is without merit. *McCleskey v. Kemp*, —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) *reh'g den*, —— U.S. ——, 107 S.Ct. 3199, 96 L.Ed.2d 686 (1987).

### VIII. *Remaining Claims*

We need not reach the remainder of appellant's claims, as they assert errors in the capital sentencing proceeding, and we have concluded that the writ will issue insofar as the sentence imposed in that proceeding is concerned. We note further that none of appellant's remaining claims raise any issues that we have not recently addressed, in some instances at considerable length, in other cases. Thus our case law will afford the participants more than ample guidance on those issues at resentencing.

### CONCLUSION

For the reasons set forth above, we REVERSE the decision of the district court and REMAND this case for further proceedings not inconsistent with this opinion.

TJOFLAT, Circuit Judge, specially concurring:

I agree with the majority's conclusions with respect to each claim presented in petitioner's habeas corpus petition. I do not completely agree with all of the majority's analysis, though, and I therefore write separately with respect to two of petitioner's claims. In Part I of this opinion, I discuss petitioner's claim that the trial court's instruction on intent denied him due process by shifting to him the burden of persuasion on that issue. In particular, I focus on the issue of whether the error in this case was harmless. In Part II, I discuss petitioner's claim that the trial court denied him due process by refusing to grant his request for funds to procure the assistance of a ballistics expert.

### I.

The trial court read to the jury the following instruction:

Members of the Jury, the law presumes that a person intends to accomplish the natural and probable consequences of his acts. If a person uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily employed to produce death and thereby causes the death of a human being, the law presumes the intent to kill.

The majority correctly concludes that the presumption contained in this instruction is constitutionally impermissible because a reasonable juror could have interpreted it as placing the burden of persuasion on the defendant to disprove an essential element

of the crime with which he was charged. *See Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The majority also concludes, again correctly, that the error is harmless in this case. The majority's harmless error analysis is unsatisfactory, however, because it fails to meet the issue head on by first distilling what it was that the jurors were told they could presume.

To analyze properly the harmless error issue in this case, we should first focus on precisely what ultimate fact the impermissible presumption would yield. From there, we should determine whether that ultimate fact was conceded by the defendant at trial. If it was, the *Sandstrom* error is harmless. If it was not, the error may still be harmless if the evidence produced at trial regarding that ultimate fact was so overwhelming that the jury would not have had to rely on the presumption. *See Tucker v. Kemp,* 762 F.2d 1496 (11th Cir.1985) (en banc), *cert. denied,* — U.S. ——, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986).

Here, the jurors were told that "the law presumes that a person intends to accomplish the natural and probable consequences of his acts." A reasonable juror would have understood this instruction to mean just what it says: that proof of an act creates a presumption of intent to bring about the consequences of that act. The ultimate fact yielded by the presumption, it must be emphasized, is *not* "criminal" intent. Rather, it is merely intent to produce a physical result by way of a voluntary physical act. The difference between the two kinds of intent is plain in a case such as this one: the latter is intent to cause

death, whereas criminal intent is intent to cause death *unlawfully.*[1]

To reiterate, then, the ultimate fact yielded by the impermissible presumption here is intent on the part of the defendant that his acts cause the victim's death. As I stated above, the unconstitutional burden-shifting resulting from the presumption is harmless if the ultimate fact was conceded at trial by the defendant. Such may be the case where, for instance, a murder defendant contends factual innocence—i.e., that he did not do the killing. Such a defendant does not contest the conclusion that the acts that caused the victim's death were intended to achieve that result; he contests only the state's contention that he, and not someone else, was the perpetrator of those acts. The impermissible burden-shifting caused by telling the jurors that a person is presumed to intend the consequences of his acts is therefore harmless because the defendant himself conceded the ultimate fact yielded by the presumption—he did not contest that the person who performed the act that resulted in the death intended that consequence. *See, e.g., McClesky v. Kemp,* 753 F.2d 877, 901–04 (11th Cir.1985) (en banc), *aff'd on other grounds,* — U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Collins v. Francis,* 728 F.2d 1322, 1350–52 (11th Cir.) (Tjoflat, J., specially concurring), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984).

Similarly, other defenses may concede an ultimate fact such that the effect of an impermissible presumption is harmless. *See Connecticut v. Johnson,* 460 U.S. 73, 87, 103 S.Ct. 969, 977, 74 L.Ed.2d 823 (1983) (plurality).[2] Whether a particular defense

---

**1.** *See infra* note 4 and accompanying text.

**2.** Justice Blackmun, writing for the plurality in *Johnson,* stated that

[i]n presenting a defense such as alibi, insanity, or self-defense, a defendant may in some cases admit that the act alleged by the prosecution was intentional, thereby sufficiently reducing the likelihood that the jury applied the erroneous instruction as to permit the appellate court to consider the error harmless. We leave it to the lower courts to determine whether, by raising a particular defense or by his other actions, a defendant himself has taken the issue of intent away from the jury.

*Johnson,* 460 U.S. at 87, 103 S.Ct. at 977–78 (citation omitted).

In *Bowen v. Kemp,* 832 F.2d 546 (11th Cir. 1987) (en banc), *cert. denied,* — U.S. ——, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988), we held that a defendant ordinarily does not concede intent as to the consequences of his acts by pleading the defense of insanity. We noted, however, that there may be cases in which the defendant, in presenting an insanity defense, does "admit that the act alleged by the prosecution was intentional." *Id.* at 550 n. 13 (quoting *Cook v. Foltz,* 814 F.2d 1109, 1113 (6th Cir.1987)). Our analysis in *Bowen* shows that each case involving a defense that potentially concedes the issue of intent

concedes some fact, of course, depends on the circumstances of each case. *Cf. Bowen v. Kemp,* 832 F.2d 546, 550 n. 12 (11th Cir.1987) (en banc), *cert. denied,* — U.S. —, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988). In this case, petitioner raised the defense of self-defense. By raising that defense, petitioner acknowledged that when he aimed the rifle at the victim and pulled the trigger, he intended the natural and probable consequences of those acts—that the charge leave the rifle, enter the victim's body, and cause the victim to die or suffer grievous bodily injury. Petitioner never contended that he fired the rifle accidentally, or that he intended only to frighten the victim or merely incapacitate him so that he could not fire back. Petitioner's own testimony was that he intended to kill the victim because the victim had fired shots at him first. Because petitioner therefore conceded by way of his defense the ultimate fact yielded by the impermissible presumption—intent that his acts bring about the victim's death—the *Sandstrom* error was harmless.

Our court has previously recognized that *Sandstrom* error may be harmless where the defendant raised the defense of self-defense. In *Holloway v. McElroy,* 632 F.2d 605 (5th Cir.1980), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981),[3] the petitioner, Holloway, claimed that the trial court had committed constitutional error in instructing the jury that a person is presumed to intend the consequences of his acts. Relying on the fact that Holloway had raised the defense of self-defense, we concluded that the error was harmless:

must be evaluated on the basis of its particular facts.

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**4.** We explained in a footnote that

[b]y "general intent" we mean intent in the sense that a person intends the consequences of his voluntary physical actions—*e.g.,* an "intentional" shooting in self-defense. The contrasting term is "specific criminal intent,"

General intent[4] is an essential element of all crimes under Georgia law (except those involving criminal negligence), *see* Ga.Code Ann. § 26–601 (1978), but Holloway has never contended that his shooting of [the victim] was unintentional— *i.e.,* that he did not intend the natural and probable consequences of his act. Holloway acknowledged that he had committed the homicide, and that he had done so intentionally. By pleading only self-defense, he voluntarily focused the entire determination of his criminal culpability on a single question—was the homicide justified? There is no denial of due process in allowing a defendant to admit some essential elements of the crime in order to put justification into issue. We are convinced that any error in the jury instructions on the intent issue are harmless beyond reasonable doubt.

*Id.* at 618 (footnotes and citation omitted). Of course, this analysis does not apply in every case involving self-defense. The defendant claiming that he acted in self-defense may, for example, assert that he fired his gun intending only to frighten the victim, not actually shoot and kill him. Or, he may assert that while he did intend to shoot the victim, he meant only to incapacitate him, not kill him. In such cases, the defendant has not on his own accord removed from the case the issue of whether he intended the natural and probable consequences of his acts, and the *Sandstrom* error cannot be considered harmless. *See Mason v. Balkcom,* 669 F.2d 222, 227 (5th Cir. Unit B 1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983).[5]

which refers to a state of mind that is thought culpable—*e.g.,* premeditation as part of murder, or "hot blood" as part of manslaughter. *Holloway,* 632 F.2d at 618 n. 26.

**5.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

We emphasized in *Mason* that the mere fact that the defendant raised the defense of self-defense, standing alone, is insufficient to remove from the case the issue of whether the defendant intended the consequences of his acts. We noted that

This case is not that kind of case, however. Petitioner never suggested that the shooting was accidental or that he intended only to frighten or incapacitate the victim. Therefore, the *Sandstrom* error was harmless.

Even if petitioner had not raised the defense of self-defense, I would find that the error was harmless in this case. As noted above, where the ultimate fact yielded by the impermissible presumption remained as a contested issue in the case, the *Sandstrom* error will still be deemed harmless if the evidence produced at trial as to that ultimate fact was overwhelming. When that is the case, the error is harmless because the jury would have found it unnecessary to rely on the invalid presumption; the predicate facts of the crime are such that we can say beyond a reasonable doubt that the jury would have inferred intent from these facts. *See, e.g., High v. Kemp*, 819 F.2d 988, 995 (11th Cir.1987) (after repeatedly telling victim that he was about to die, defendant ordered victim to lie on ground and then shot him); *Potts v. Kemp*, 814 F.2d 1512, 1515–16 (11th Cir.1987) (defendant drove victim to dirt road, forced him out of car, and then shot him); *Burger v. Kemp*, 785 F.2d 890, 892 (11th Cir.1986) (defendant locked victim in car trunk and then submerged car in pond), *aff'd*, —— U.S. ——, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Dobbs v. Kemp*, 790 F.2d 1499, 1509 (11th Cir.1986) (defendant ordered victim to lie on floor and then shot him in stomach), *cert. denied*, —— U.S. ——, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987); *Tucker v. Kemp*, 762 F.2d 1496, 1502–03 (11th Cir.1985) (en banc) (victim died of one crushing blow to skull), *cert. denied*, —— U.S. ——, 106 S.Ct.

3340, 92 L.Ed.2d 743 (1986); *cf. Francis v. Franklin*, 720 F.2d 1206, 1212 (11th Cir. 1983) (evidence of intent not so overwhelming as to render *Sandstrom* error harmless where defendant's gun went off after victim slammed door into it), *aff'd*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

Here, the evidence of intent was undeniably overwhelming as to whether petitioner intended the natural and probable consequences of his acts. Petitioner approached the car in which the victim was sitting and, at close range, fired a shot through the windshield. He then walked to the side of the car and fired a shot through the side window. Expert testimony at trial established that these first two shots seriously injured and probably totally disabled the victim. According to eyewitness testimony, petitioner then slowly walked behind the car, calmly brought the rifle to his shoulder, and fired a shot through the rear window into the victim's chest. Presented with these facts, I am confident beyond a reasonable doubt that the jury did not have to rely on the invalid presumption to find that petitioner intended to kill the victim. Thus, even if petitioner had not raised the defense of self-defense and the issue of whether he intended the consequences of his acts had therefore remained a contested issue in the case, I would hold that the evidence of intent was so overwhelming as to make the *Sandstrom* error harmless in any event.

## II.

I agree with the majority's conclusion that petitioner was not denied due process by the state's failure to provide him funds to procure the assistance of a ballistics

---

[w]hen claiming self-defense, one does not *necessarily* admit intent to kill, but rather admits that the killing occurred. As the petitioner points out in his brief, one can shoot to kill in self-defense, shoot to wound in self-defense, shoot to frighten in self-defense, or even shoot reactively in self-defense with no specific purpose.

*Mason*, 669 F.2d at 227 (emphasis added). *See also Patterson v. Austin*, 728 F.2d 1389, 1395–96 (11th Cir.1984).

*Mason* should not be read as standing for the proposition that raising the defense of self-defense *never* concedes intent as to the conse-

quences of one's acts. Not only would such an interpretation be inconsistent with the language in *Mason* quoted above, but it would be directly contrary to our holding in *Holloway*, a binding case that preceded *Mason*. *See supra* note 3 and accompanying text. *Mason*, a panel opinion, cannot be deemed to have overruled *Holloway*, because in this circuit only the court sitting en banc can overrule binding precedent. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). *Mason* should be read as merely standing for the proposition that whether raising self-defense concedes intent depends on the particular facts of the case.

expert. I would reach that conclusion, however, by way of a different analysis.

In *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Id.* at 74, 105 S.Ct. at 1091–92. In this case, petitioner sought the assistance not of a psychiatrist, but of a ballistics expert. Our court thus far has avoided deciding whether *Ake* applies to an indigent defendant's request for expert assistance other than psychiatric assistance. *See Moore v. Kemp,* 809 F.2d 702 (11th Cir.) (en banc) (request for criminologist), *cert. denied,* —— U.S. ——, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987); *see also McKinley v. Smith,* 838 F.2d 1524 (11th Cir.1988) (request for pathologist). In *Moore* we assumed for the sake of argument that *Ake* does apply to requests for nonpsychiatric expert assistance, and held that a failure by the state to grant such a request would not violate the due process clause unless (1) the defendant had demonstrated to the trial court a sufficient need for the expert assistance, and (2) the trial court's failure to grant the request rendered the defendant's trial fundamentally unfair. *See Moore,* 809 F.2d at 710. In *Moore* we denied relief after concluding that the petitioner failed to meet the first prong, i.e., failed to present the trial court with enough information to enable that court to make a ruling granting the request for expert assistance.

Taking a tack similar to that which we took in *Moore,* the majority in this case focuses on whether petitioner made a sufficient showing of need before the trial court, and concludes that he did not. In my view, that issue is superfluous because petitioner's *Ake* claim clearly fails on the second prong of the *Moore* analysis: petitioner has not in any way shown that the denial of his request for expert assistance rendered his trial fundamentally unfair.

Petitioner's argument is that he needed a ballistics expert to help him develop his claim of self-defense. Petitioner's defense, as developed through his testimony at trial, was as follows. Petitioner testified that he was pulled over by a police car driven by the victim, and that petitioner stopped his car and got out, carrying a stolen rifle. According to petitioner, his intention was merely to hand the rifle over to the victim. The victim, however, still sitting in the police car, allegedly opened fire, and petitioner fired back in self-defense.

In light of his defense, we might guess that petitioner wanted a ballistics expert to provide assistance in establishing the sequence in which the shots were fired. Under the best possible scenario from petitioner's perspective, a ballistics expert would have been able to establish that the victim fired the first shot. In my view, however, the jury undoubtedly would have still disbelieved petitioner's claim of self-defense.

At trial, the prosecutor presented the testimony of a mail carrier who had happened upon the shooting scene just after the initial exchange of fire. The mail carrier testified that he saw petitioner slowly walk behind the police car in which the victim was sitting, calmly and deliberately raise his rifle to his shoulder, and fire a shot through the car's rear window. The victim, already disabled as a result of the initial exchange of fire, died almost immediately when this final shot tore through his heart.

Petitioner does not point to anything that a ballistics expert could have established that would have in any way contradicted or undermined the testimony of the eyewitness. In light of the eyewitness' testimony concerning the manner in which the victim was killed, I am confident that expert testimony regarding who shot first would have made no difference to the outcome of the trial. Thus, because his trial was not rendered fundamentally unfair by the state's refusal to give him funds to procure the assistance of a ballistics expert, petitioner's *Ake* claim must fail.

ANDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in all of Judge Hill's opinion for the court, except Part I dealing with the claim based upon *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). With respect to that issue, I respectfully dissent. As the majority notes, our recent in banc opinion in *Moore v. Kemp,* 809 F.2d 702 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987), elaborates upon the pretrial showing which is necessary to sustain an *Ake* claim. The majority concludes that Stephens failed to make the required showing. With respect to the showing made by Stephens in this case, the only deficiencies suggested by the majority are the following: (1) that Stephens did not inform the trial judge of the type of test needed; (2) that Stephens did not demonstrate that the issue inherently requires expertise; (3) that Stephens was merely seeking to challenge the credibility of the state's experts; and (4) that Stephens did not inform the trial judge as to what an expert could be expected to contribute to his defense.[1]

Respectfully, I suggest that the deficiencies relied upon by the majority, and its conclusions, are not supported in the record.

First, although the majority asserts that Stephens never informed the court of the type of testing which could be performed, the immediately preceding sentence of the majority's own opinion acknowledged that "the defendant desired funds to retain a ballistics expert to determine whether Officer Stephens had fired his gun and the path those shots would have taken." I submit that the record is clear that Stephens was requesting *ballistics* tests.

Second, the majority asserts that Stephens made no showing that the ballistics issue inherently requires expertise. I disagree. Stephens' written motion stated that much of the evidence concerned, among other things, "ballistics tests, trajectory patterns of various bullets, firearms examinations, [and] reconstruction of window glass." The motion continued claiming that Stephens needed expert assistance in order to examine this evidence and determine whether or not the victim had fired his pistol, the paths of the bullets fired by the victim, the number of bullets fired by the victim and by Stephens, the sequence of firing, the implosion or explosion of glass from the victim's vehicle, and an identification of the guns from which the bullets in the state's possession were fired. It should have been apparent to the trial judge that the evidence in question was complex and could not be analyzed by lay witnesses without a high risk of error. Stephens' attorney attempted to get this point across to the trial judge when he stated at the hearing, "I am not an expert—I can go in there and I can look at something and I can't determine whether or not the trajectory of fire which the state says may have occurred is in fact what occurred."

Another indication that the trial judge should have known that Stephens' self-defense claim depended on complex expert analysis was that the trial judge knew that the state had used its own experts in preparing for trial and intended to use that expertise in presenting its case against Stephens. This fact is evident from the following exchange between the prosecutor and the trial judge at the hearing on Stephens' motion:

Mr. Purcell (the prosecutor): ... What he seeks to do here, Your Honor, is to have one of his experts ... go over everything and run all the tests and do that sort of thing. I believe he has—

The Court: That's already been done?

1. The majority also points out that the defense motion for experts was made one year after the crime, and that the deceased officer's hands probably could not be tested for gun powder at that late date. While the delay might well have affected that particular test, it is unlikely that the delay would have impeded the more significant ballistics tests which were sought by Stephens. Significantly, delay was not mentioned by the prosecutor or the trial judge as a reason for denying the motion.

Mr. Purcell: Yes, sir. It's already been done, which will be introduced at trial....

Transcript of Hearing at 15.

In addition, the trial judge's *in camera* review of the state's evidence should have alerted him to the complexity of the ballistics issue. The judge must have discovered the fact that the state had three experts who would testify about blood and tissue spatter patterns, bullet fragments, trajectories and flight paths, and glass shatter patterns. The judge must have known that the state planned to reconstruct the sequence of events using such expert testimony and physical and photographic evidence. Also, common sense should have suggested to the judge that such matters could not be adequately analyzed by laymen and are likely to be subject to varying expert interpretations. *See Ake*, 470 U.S. at 82–83, 105 S.Ct. at 1096.[2]

Third, the majority suggests that Stephens' request for experts was deficient in that it merely sought to challenge the credibility of the state's experts. However, it is apparent from *Ake* that the Supreme Court was sensitive to the risk of error involved when such a crucial determination is subject to varying expert interpretations, 470 U.S. at 82–83, 105 S.Ct. at 1096, and the only expert evidence is that provided by the state. 470 U.S. at 84–85, 89–90, 105 S.Ct. at 1097, 1099.

Finally, the majority asserts that Stephens did not inform the court as to what an expert could be expected to contribute to his defense, which led to the majority's conclusion that Stephens did not show that the ballistics issue would be a significant factor at trial. Respectfully, I conclude that the record indicates otherwise. A fair reading of the record suggests that it was clear to all concerned that the sequence of the firing of the various weapons and who fired first would be a significant factor at trial. In paragraph 4 of his pretrial motion, Stephens listed the reasons he felt he needed an independent expert to examine the state's evidence. Among those reasons were the need "to determine whether ... the deceased ... fired his service pistol prior to his death, the paths of the bullets fired by the deceased, the number of bullets fired from both the deceased's pistol and allegedly from the rifle of Defendant, the sequence of firing of various weapons, the implosion or explosion of glass from the vehicle of the deceased, and an examination of the bullets to determine from whose weapon they were fired." Implicit in this paragraph is Stephens' intention to claim that the deceased fired the first shot and Stephens acted in self-defense. Also, at the hearing on the motion, Stephens' lawyer stated that "the whole theory of the defendant's case rests upon the examination [of the state's] evidence...." Transcript of Hearing at 15. This statement and Stephens' written motion were sufficient to inform the trial judge that the ballistics issue was crucial to his defense. Although the trial judge could not know at the pretrial hearing stage what evidence would ultimately be presented, the trial judge did conduct an *in camera* review of the state's evidence before ruling on the motion, and thus must have discovered that the state would call three expert witnesses to analyze blood and tissue spatter patterns, bullet fragments, bullet trajectories and flight paths, and glass shatter patterns. This should have been sufficient to alert the judge to the probability that the ballistics issue would be a significant factor. In fact, Stephens' assertion that the ballistics issue was crucial was borne out at trial. Stephens' *sole* theory of defense at trial was that of self-defense. This contention, in turn, was totally dependent on Stephens' assertion that the victim fired the first shot. Thus, the question of who fired the first shot could hardly have been more important to Stephens' defense.

---

**2.** That these matters are in fact subject to varying expert interpretations was borne out by the affidavits and depositions proffered in Stephens' federal habeas corpus proceedings. These experts reach different conclusions than those reached by the state's experts at trial, specifically contradicting the conclusion that the physical evidence refutes Stephens' contention that the victim fired first. *See* Depositions of Fassnacht and Riddick.

I conclude that the demonstration made by Stephens to the trial judge satisfied the requirements articulated by the Supreme Court in *Ake* and by this court in *Moore*. Stephens showed not only the type of tests needed, i.e., ballistics tests, but also the name of an available expert. He showed that the issue was one subject to varying expert interpretations, and one as to which lay opinion would be inadequate. The trial judge conducted an *in camera* review of the state's evidence, thus enabling the judge to evaluate the nature of the prosecution's case and the nature of the rebuttal evidence being requested and the degree of need therefor. I conclude that it should have been apparent to the trial judge that the sequence of firing and who fired first was crucial to the defense and would be a significant factor at trial. When the only evidence on this complex issue came from the state's expert, and Stephens was denied the opportunity to consult with or present his own expert, Stephens, like Ake, could not "offer a well-informed expert's opposing view and therefore loses a significant opportunity to raise in the jurors' minds questions about the State's proof." *Ake*, 470 U.S. at 84, 105 S.Ct. at 1097.[3]

---

**3.** In an alternative holding, the majority finds overwhelming evidence that Stephens did not act in self-defense, because a disinterested witness observed the final moments of the incident, observing Stephens walking slowly to the rear of the car and firing a final shot into the car. However, it is clear that the disinterested witness's testimony is not relevant at all to the issue of who fired the first shot. *See* footnote 16 of the majority opinion acknowledging that the disinterested witness could not testify concerning who fired first. In my judgment, if the

officer did fire the first shot, I would be reluctant to conclude that there is overwhelming evidence that Stephens was not acting in self-defense.